In the United States District Court
for the District of Kansas

——————————

Case No. 22-cv-01164-TC

——————————

STEVEN C. STAVIG,

*Plaintiff*

v.

SUMNER-COWLEY ELECTRIC COOPERATIVE, INC., ET AL.,

*Defendants*

——————————

## MEMORANDUM AND ORDER

Steven Stavig, who was electrocuted while power washing a roof, sued six defendants based on negligence arising under Kansas state law. Doc. 64 at 3. Two defendants move for summary judgment. Doc. 126; Doc. 128. For the following reasons, their motions are denied.

### I

### A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R.

1

56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

In a case where the moving party does not bear the burden of persuasion at trial, the summary judgment rules require that party to show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

But in a case where the moving party will bear the burden of proof at trial on a particular issue, the moving party must meet "a more stringent summary judgment standard." *Pelt*, 539 F.3d at 1280; *see also Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015) (discussing a movant with affirmative defenses). That standard requires the movant to "establish, as a matter of law, all essential elements of the issue." *Pelt*, 539 F.3d at 1280. Only then must the nonmovant "bring forward any specific facts alleged to rebut the movant's case." *Id.*

## B

Stavig was unemployed and wanted to start his own power washing business. Doc. 127 at ¶¶ 8, 59.[1] He contacted a contractor, Phil Ray, to pursue that goal. *Id.* at ¶¶ 8–9. They talked for several hours, *id.* at ¶ 11, and discussed "the possibility of [Stavig] purchasing some of Ray's equipment," *id.* at ¶ 10. Their discussion led to an invitation. Doc. 127 at ¶ 12; Doc. 140 at 4, ¶ 12. Ray would bring Stavig to a job, "where the coating on the roof of a building needed to be stripped." Doc. 127 at ¶ 13. There, "Ray would show [Stavig] how to power wash the roof."

---

[1] All document citations are to the document and page number assigned in the CM/ECF system. All facts are either uncontroverted or, where controverted, stated in the light most favorable to Stavig.

2

*Id.* Ray also offered Stavig the opportunity to work the job, and Stavig accepted. *Id.* at ¶¶ 14, 16.

The agreement between Stavig and Ray implicates multiple entities and individuals. One is an electric company, Sumner-Cowley Electric Cooperative, Inc. Doc. 64 at 2. Another is Abrams Managed Enterprises, Inc., which owns a building in Arkansas City. *Id.* at 2, 12; Doc. 168 at ¶ 2.a.i. The remaining three, Brett Thomson, Phil Ray, and J&J Power Line Contractors, Inc., are contractors. Doc. 64 at 2. The parties are related in the following way: Abrams hired Thomson as the general contractor to perform work on the roof. Doc. 168 at ¶ 2.iv. Thomson hired Ray as a subcontractor to power wash the roof. *Id.* at ¶ 2.v. Finally, Ray invited Stavig to come along on the power washing job.[2] Doc. 127 at ¶ 12, Doc. 140 at 4, ¶ 12. Sumner-Cowley and J&J are more tangentially related. Sumner-Cowley constructed a distribution line on the Abrams building and "owns the power lines" related to that building. Doc. 168 at ¶ 2.a.vii. It allegedly uses J&J to maintain those lines. Doc. 68 at ¶ 20; Doc. 168 at 6.

The day of the job (and accident), Stavig and Ray met at Ray's shop. *See* Doc. 127 at ¶ 19. Stavig then followed Ray, in his own vehicle, to Brett Thomson's shop. *See id.* at ¶ 24. Thomson is a general contractor who hired Ray to complete the power washing job. *Id.* at ¶ 3. Thomson provided soap, but Ray provided all the other equipment: the trailer, power washer, hoses, and so on. *Id.* at ¶¶ 24, 26. Ray and Stavig then travelled to the jobsite, still in separate vehicles. *Id.* at ¶ 24. There, Ray warned Stavig "to stay away from electricity" and told him about a prior "experience [Ray had] … with electricity." Doc. 127 at ¶¶ 29, 32; Doc. 140 at 5, ¶ 29. They proceeded onto the roof and noticed a power line. Doc. 127 at ¶¶ 36, 38. Ray warned Stavig to stay away from it and "to watch where he stepped," because the roof was only reinforced in some spots. Doc. 127 at ¶¶ 34, 37, 40; Doc. 140 at 5, ¶ 33.

Stavig says he walked diagonally across the roof, ducking "under the power line to reach the far side of the roof." Doc. 127 at ¶ 39. The two then left the roof and returned to Ray's work truck. *Id.* at ¶ 45. Ray showed Stavig "how to start the power washing equipment" and allowed him to do so. *Id.* at ¶ 45. He then "gave [Stavig] the option either to feed the hose up the ladder to Ray or to climb the ladder himself

---

[2] The remaining contractor, J&J, is not at issue in either Ray or Thomson's motions. *See generally* Doc. 127; Doc. 129. J&J is a contractor that allegedly performs lineman work for Sumner-Cowley. Doc. 168 at 5–6.

while Ray fed the hose up to him." *Id.* at ¶ 46. Stavig chose the second option. *Id.* So "Ray fed the hose up to [Stavig] as [Stavig] climbed the ladder." *Id.* at ¶ 47.

Shortly after Stavig reached the roof, Ray heard a noise. He "yelled three times without hearing a response" and then climbed up to check on Stavig. *Id.* at ¶ 48. On the roof, he found Stavig "having what looked like a seizure" and called emergency services. *Id.* at ¶ 49.

Stavig was electrocuted on the roof. *See* Doc. 127 at ¶ 53. The roof power lines were between five and five feet, six inches off the roof; Stavig is roughly six feet tall. Doc. 140 at 12, ¶ 23.

Stavig sued Ray and Thomson for negligence and seeks punitive damages. Doc. 1. Ray and Thomson counter that Stavig cannot sue in tort because he was Ray's employee. Doc. 127 at 27; Doc. 129 at 17. Kansas employees are subject to the Kansas Workers' Compensation Act. The Act lets an employee sue their employer if they were injured "in the course of employment," but forecloses tort remedies. Kan. Stat. Ann. § 40-501(b); *see also Dillard v. Strecker*, 877 P.2d 371, 374 (Kan. 1994). In the alternative, Ray seeks partial summary judgment on Stavig's punitive damages request. Doc. 127 at 23. Even if Stavig was not an employee, Ray says, no jury could find him liable for punitive damages.

## II

Whether Stavig was Ray's "employee" depends on disputed facts. *Cf.* Doc. 127 at 11; Doc. 129 at 1. So does Stavig's ability to recover punitive damages. *Cf.* Doc. 127 at 1. Accordingly, both Ray and Thomson's motions for summary judgment are denied.

## A

Ray and Thomson assert that they are entitled to summary judgment because Stavig was their employee, not a volunteer or an independent contractor. Docs. 127 & 129. But a reasonable factfinder could conclude, viewing the facts in the light most favorable to Stavig, that he was an independent contractor.

The Kansas Workers' Compensation Act creates an exclusive remedy for Kansas employees injured "in the course of employment."[3] Kan. Stat. Ann. § 40-501b(b); *see also Dillard v. Strecker*, 877 P.2d 371, 374 (Kan. 1994). Under the Act, an "employee" is "any person who has entered into the employment of or works under any contract of service or apprenticeship with an employer." Kan. Stat. Ann. § 44-508(b). The term "employee" does not include independent contractors. *See id.*; *Jones v. Dodge City*, 402 P.2d 108, 111 (Kan. 1965); *Hartford Underwriters Ins. Co. v. State, Dep't of Hum. Res.*, 32 P.3d 1146, 1151 (Kan. 2001), as corrected (Oct. 25, 2001); *cf. Milano's, Inc. v. Kansas Dep't of Lab., Contributions Unit*, 293 P.3d 707, 712–13 (Kan. 2013).

On the other hand, volunteers are sometimes treated as "employees." Kan. Stat. Ann. § 44-508(b). Volunteer firefighters, police, and emergency medical services count, "but only to the extent and during such periods as they are so serving in such capacities." *Id.* People who work for churches and charities also count, but "only to the extent and during the periods that they are paid wages by such organizations." *Id.* And the Act sweeps in "volunteers in any employment" along with "persons performing community service work," but in either case only if someone has elected "to extend coverage" to them. *Id.*

Stavig does not fit any of these categories. He was not a fireman, policeman, or emergency medical worker. *See* Doc. 127 at ¶ 8. He was not paid. *Id.* at ¶ 18 (expressing that Ray only "intended" to pay Stavig). Nor was he covered by an elective extension of coverage. Doc. 140 at 9, ¶ 12; Doc. 149 at 6, ¶ 12. So a jury could find that Stavig was not one of the rare volunteers covered by the Act.

Similarly, a jury could find that Stavig was not an employee under the Act. Kansas courts use several tests to answer this question. The "primary test … is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the

---

[3] The Act governs the parties' dispute because Kansas law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). If Kansas's law is ambiguous, a federal district court must look to the Kansas Supreme Court's rulings. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (citing *High Plains Nat. Gas Co. v. Warren Petroleum Co.*, 875 F.2d 284, 288 (10th Cir. 1989)). And "if no such rulings exist, [it] must endeavor to predict how the high court would rule." *Finstuen v. Crutcher*, 496 F.3d 1139, 1148 (10th Cir. 2007) (quoting *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 899 (10th Cir. 2006)).

result which is to be accomplished."[4] *Craig v. FedEx Ground Package Sys., Inc.*, 335 P.3d 66, 74 (Kan. 2014) (quoting *Jones v. City of Dodge City*, 402 P.2d 108 (Kan. 1965)). Another test considers 20 factors which, more than anything, reflect that "there is no absolute rule for determining whether an individual is an independent contractor or an employee." *Hartford Underwriters*, 32 P.3d at 1151; *Danes v. St. David's Episcopal Church*, 752 P.2d 653, 660 (Kan. 1988). Thus, "[t]he facts and circumstances in each case determine the status of the individual." *Hartford Underwriters*, 32 P.3d at 1151. Often, the facts and circumstances of a case include an express contract. *See id.* But an express contract is not required. Kan. Stat. Ann. § 44-508(b) (defining an employee as "any person who has entered into the employment of *or* works under any contract of service or apprenticeship with an employer") (emphasis added); *see also Knoble v. Nat'l Carriers, Inc.*, 510 P.2d 1274, 1281 (Kan. 1973).

Stavig implies that he never discussed other jobs with Ray, Doc. 140 at 4, ¶ 17, and he disagrees that Ray ever "invited [Stavig] to come work with him," *id.* at 4, ¶ 12. Moreover, although Ray was "agreeable to [Stavig] working as much as he wanted … until he got his own equipment," he never discussed that possibility with Stavig. Doc. 127 at ¶ 17; Doc. 140 at 4, ¶ 17 ("Controverted that other jobs were ever discussed…"). Those things cut against an employer-employee relationship, because Kansas considers "the existence of a continuing relationship between the worker and the employer," "the degree of establishment of set work hours," and "the requirement of full-time work" when separating employees from independent contractors. *Hartford Underwriters*, 32 P.3d at 1152. Since "Stavig never applied for a position of any kind" with Ray, Doc. 140 at 9, ¶ 10, these factors do not suggest employment.

Other factors also cut against an employer-employee relationship, at least when the facts are read in Stavig's favor. Stavig and Ray did not

---

[4] These tests are designed to separate employees from independent contractors. *See Hartford Underwriters*, 32 P.3d at 1151. Even so, identifying an independent contractor means identifying someone who is not an employee, and the question under the Act is whether someone is or is not an employee. Kan. Stat. Ann. § 44-508(b). Thus, courts apply these tests even in situations like Stavig's, where the alleged employee is likely neither an employee nor an independent contractor. *See, e.g., McCubbin By & Through McCubbin v. Walker*, 886 P.2d 790, 796 (Kan. 1994) (applying the standard tests and concluding that the evidence did not "support a finding that McCubbin was [either] an employee or [an] independent contractor").

discuss "Stavig being paid for his time on the date of" Stavig's injury. Doc. 140 at 9, ¶ 6. But courts consider things like "whether payment is by the hour, day or job" and "the extent to which the employer pays business or travel expenses of the worker" when identifying employees. *Hartford Underwriters*, 32 P.3d at 1152. Payment by the hour suggests standard employment, whereas payment by the job suggests an independent contractor relationship. *Shindhelm v. Razook*, 372 P.2d 278, 280 (Kan. 1962). Stavig is a step removed from either situation because he was not paid at all. *See* Doc. 127 at ¶ 17; *Roark v. Roark Motor Co.*, 413 P.2d 1019, 1021 (Kan. 1966) (reasoning that "employment" anticipates an agreement to work in exchange for compensation).

Still more factors underscore Stavig's unusual situation. A state court would consider things like "the right of the employer to require compliance with instructions," "the extent of any training provided by the employer," and "the degree to which the employer sets the order and sequence of work." *Hartford Underwriters*, 32 P.3d at 1152. Ray did these things. Doc. 127 at ¶¶ 19, 34–35; Doc. 140 at 5, ¶ 30; *but see* Doc. 140 at 5, ¶ 27 (controverting that the two discussed safety precautions). Even so, a jury could readily conclude that Stavig sought Ray for training as such, not employment that happened to require training. *See* Doc. 127 at ¶¶ 8–11. The "training provided by [an] employer" matters most when that training is not an end in itself. *See Hartford Underwriters*, 32 P.3d at 1154 (finding an employer-employee relationship in part because an employer trained his assistants to work for him). So this factor does not cut strongly in favor of an employer-employee relationship.

Ray has not shown that the undisputed facts make Stavig an employee. To be sure, he had substantial control over Stavig. Doc. 127 at ¶¶ 19, 34–35; Doc. 140 at 5, ¶ 30. His control looks different, however, in the context of Stavig's request to learn from Ray. *See* Doc. 127 at 21 (describing Stavig's training). While Stavig participated in the power washing, he was not paid, Doc. 140 at 9, ¶ 6, and did not promise to work future jobs, Doc. 127 at ¶ 17; Doc. 140 at 4, ¶ 17. A reasonable factfinder could conclude that Stavig was an independent contractor— or, more likely, neither independent contractor nor employee. *Contra*

Doc. 127 at 12 ("Stavig was one or the other that day….").[5] Accordingly, Ray does not show that he is entitled to judgment as a matter of law. *Mitzner By & Through Bishop v. State*, 891 P.2d 435, 438 (Kan. 1995) ("'[G]enerally speaking, the question of whether an individual is an employee or an independent contractor is considered a question of fact for the jury or trier of facts.'")

**B**

Thomson's motion for summary judgment overlaps with Ray's motion. Thomson is a general contractor who subcontracted a power washing job to Ray. Doc. 129 at ¶ 10. Under the Act, a general contractor can be liable to a subcontractor's employees. Kan. Stat. Ann. § 44-503(a); *Schafer v. Kansas Soya Prod. Co.*, 358 P.2d 737, 741–42 (Kan. 1961) ("[A principal] shall be liable to pay compensation to any injured workman employed in pursuance of the contract to the same extent as though such workman had been immediately employed by the principal."). These entities are "statutory employers." *Miller v. NEP Grp., Inc.*, No. 15-CV9701, 2017 WL 2151843, at *5 (D. Kan. May 17, 2017).

Thomson says that he was Stavig's statutory employer. Doc. 129 at 17. Before he can be Stavig's statutory employer, though, Ray must be Stavig's general employer. *See* Kan. Stat. Ann. § 44-503(a); *Scott v. Altmar, Inc.*, 38 P.3d 673, 676 (Kan. 2002) (citation omitted) ("Where the injured employee is determined to be both a special [i.e., statutory] employee and a general employee, he or she may look to either or both of his or her employers for compensation."). As explained, a factfinder may conclude that Ray is not Stavig's general employer. Section II.A., *supra*. It follows that a factfinder may likewise conclude that Thomson was not Stavig's statutory employer. That ambiguity precludes summary judgment in Thomson's favor.

**C**

In the alternative, Ray requests partial summary judgment on the question of punitive damages. Doc. 127 at 23. Punitive damages "punish the wrongdoer for malicious, vindictive, or willful and wanton

---

[5] Again, the dichotomy between employee and independent contractor is awkward in a case like this one. *See* Doc. 140 at 13 (arguing that Stavig is "volunteer labor" or "self-employed"). But awkward or not, Kansas courts deploy it—and its accompanying tests—in these circumstances. *See, e.g., Walker*, 886 P.2d at 796. A federal court must do likewise. *See Klaxon Co.*, 313 U.S. at 496.

invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." *Cerretti v. Flint Hills Rural Elec. Co-op. Ass'n*, 837 P.2d 330, 344 (Kan. 1992); *see also Alain Ellis Living Tr. v. Harvey D. Ellis Living Tr.*, 427 P.3d 9, 19 (Kan. 2018). A plaintiff who seeks punitive damages must prove "by clear and convincing evidence … that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." Kan. Stat. Ann. § 60-3702(c); *W–V Enters., Inc. v. Fed. Sav. & Loan Ins. Corp.*, 673 P.2d 1112, 1124 (Kan. 1983).

Stavig could meet this standard. It will require him to show that Ray had "knowledge of a dangerous condition" and was "indifferen[t] to the consequences" of that condition. *Reeves v. Carlson*, 969 P.2d 252, 256 (Kan. 1998); *see also Adamson v. Bicknell*, 287 P.3d 274, 281 (Kan. 2012). Ray does not seriously dispute that he knew the job could be dangerous. Doc. 127 at 26 ("[R]ecall all of the admonitions acknowledged by Stavig to keep them both safe."). Instead, he argues that he did not ignore the danger. *Id.* at 27 ("Ray repeatedly demonstrated awareness and concern for potential danger….").

Yet Stavig could convince a jury that Ray ignored the danger—in other words, that his conduct was wanton. Stavig argues that "Ray was aware of the dangers posed by the Power Lines." Doc. 140 at 22. Indeed, Ray "had heightened awareness due to being injured by electrical wires on a prior job." *Id.* (citing Doc. 140 at 11, ¶ 20). But "[r]ather than halting work and calling the power company," which could have repaired or deenergized the lines, he "chose to continue with the work." *Id.* And he did so with an "inexperienced rooftop power washer" like Stavig. *Id.*; *see also* Doc. 127 at ¶ 8. This is enough to convince a jury of Ray's "reckless indifference to the consequences." *Adamson*, 287 P.3d at 281.

Moreover, the parties dispute many of the facts that could resolve this issue. Ray received photographs of the job site. Doc. 149 at 7, ¶ 21. But he insists that the photographs did not accurately portray "the location of the power lines in relation to the roof peak." *Id.* Either way, Ray was on the roof before Stavig. Doc. 127 at ¶ 35. While on the roof, Ray says, he observed that the power lines were not dangerously low. *See id.* at ¶ 36. But viewing the facts in the light most favorable to Stavig, a jury could conclude that Ray should have thought otherwise—after all, he "told [Stavig] that they should stay away from [the lines]." *Id.* at ¶ 37. If the lines were dangerously low, Ray should have called the power company. Doc. 149 at 7, ¶ 25; Doc. 140 at 12, ¶ 26. But he did not. Doc. 140 at 12, ¶ 25. He also may have "discussed general electricity safety measures" like "watching out for power lines and avoiding

electricity." Doc. 127 at ¶ 29; Doc. 140 at 5, ¶ 29 (agreeing that Ray at least "told Stavig to 'stay away from electricity'"). Still, these general warnings are not necessarily sufficient given what Ray may have observed on the roof. If a jury believes Ray, it may conclude that he did what he could under the circumstances. But the jury could also reject his assertions, and from there conclude that his conduct was wanton. *See Gould v. Taco Bell*, 722 P.2d 511, 517 (Kan. 1986) (allowing punitive damages for wanton conduct when a restaurant manager refused to intervene or call police when two patrons were being beaten).

Likewise, the parties dispute whether Ray told Stavig that the lines were deenergized. Stavig remembers being told as much. Doc. 140 at 12, ¶ 27. Ray disagrees, saying Stavig has contradicted himself on this point. Doc. 149 at 7, ¶ 27. These issues could resolve whether Ray ignored a clear risk of danger. And they require a jury's insight because many of them depend on credibility assessments. *McElhaney v. Thomas*, 405 P.3d 1214, 1222 (Kan. 2017). Some cases exclude punitive damages as a matter of law, but they do not present analogous evidentiary disputes. *Fusaro v. First Fam. Mortg. Corp.*, 897 P.2d 123, 130 (Kan. 1995) (agreeing, in the context of a motion to amend, that a plaintiff "simply relie[d] on conclusory allegations"); *cf. McElhaney*, 405 P.3d at 1222 (reasoning that a plaintiff "was entitled to present her claim for punitive damages to the jury solely by virtue of her battery claim" because battery must be intentional).

### III

For the foregoing reasons, Ray's Motion for Summary Judgment, Doc. 126, and Thomson's Motion for Summary Judgment, Doc. 128, are DENIED.

It is so ordered.

Date: July 11, 2024          \_s/ Toby Crouse_____
                              Toby Crouse
                              United States District Judge